UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Action |
| | ) | No. 22-MJ-76-1 |
| vs. | ) | No. 22-MJ-76-2 |
| | ) | |
| ARIAN TAHERZADEH and | ) | April 12, 2022 |
| HAIDER ALI, | ) | 4:08 p.m. |
| Defendants. | ) | Washington, D.C. |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**TRANSCRIPT OF DETENTION HEARING (continued)**
**BEFORE THE HONORABLE G. MICHAEL HARVEY,**
**UNITED STATES DISTRICT COURT MAGISTRATE JUDGE**
*(Parties appearing via videoconference and/or telephonically)*

**APPEARANCES:**

FOR UNITED STATES:   JOSHUA SETH ROTHSTEIN
                     DOJ-CRM, Criminal Division
                     555 4th St NW
                     Washington, DC 20530
                     (202) 252-1900
                     Email: joshua.rothstein@usdoj.gov

FOR A. TAHERZADEH:   MICHELLE PETERSON
                     Federal Public Defender
                     for the District of Columbia
                     625 Indiana Avenue, NW
                     Washington, DC 20004
                     (202) 208-7500
                     Email: shelli_peterson@fd.org

FOR H. ALI:          GREGORY S. SMITH
                     913 East Capitol Street, SE
                     Washington, DC 20003
                     (202) 460-3381
                     Email: gregsmithlaw@verizon.net

ALSO PRESENT:        ANDRE SIDBURY, Pretrial Officer
                     MASOUD TAHERZADEH
                     SHOUTKAR RAZA

Court Reporter:      Elizabeth Saint-Loth, RPR, FCRR
                     Official Court Reporter

***This hearing was held via videoconference and***
***telephonically and is therefore subject to the limitations***
***associated with the use of technology, static interference, etc.***

Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

**P R O C E E D I N G S**

THE COURT:  Good afternoon.  This is Judge Harvey.

Mr. Tran, please call the case.

THE COURTROOM DEPUTY:  This is Case 22-MJ-76,

United States of America versus Arian Taherzadeh and Haider

Ali.  This is scheduled to be a continued detention hearing

to be held by video.

Would the parties please introduce themselves to

the Court, beginning with the government.

MR. ROTHSTEIN:  Good afternoon, Your Honor.

Josh Rothstein on behalf of the United States.

MS. PETERSON:  Good afternoon, Your Honor.

Michelle Peterson on behalf of Mr. Taherzadeh who is present

and agrees to proceed by video pursuant to the CARES Act.

MR. SMITH:  Your Honor, Greg Smith representing

Haider Ali who is also present and willing to proceed by way

of video.

MR. SIDBURY:  Good afternoon, Your Honor.

Andre Sidbury for pretrial services.

THE COURT:  Mr. Sidbury, I had a question for you.

This is Judge Harvey.

I want to inquire whether or not the two

residences, the parents' residences are -- do they qualify

for HISP?  And were the parents or the fathers of each

defendant -- has pretrial determined them to be suitable

1      third-party custodians?

2               Mr. Sidbury, did you hear me?

3               MR. SIDBURY:  I did, Your Honor.

4               For Mr. Taherzadeh, he is eligible --

5               M. TAHERZADEH:  Can you hear me?

6               THE COURT:  Mr. Taherzadeh, please be quiet.

7               M. TAHERZADEH:  Thank you.

8               MR. SIDBURY:  He will be eligible for third-party

9      custody, however, he will not be eligible for HISP because

10     he does not own the residence.

11              THE COURT:  Okay.  What does that have to do with

12     it?

13              MR. SIDBURY:  In order for the defendant to

14     live -- to be a part of electronic monitoring, the homeowner

15     has to agree that the defendant can stay there.  The father

16     does not own the residence.

17              THE COURT:  He rents it?

18              MR. SIDBURY:  According to the information that

19     was provided to pretrial, the brother is the leaseholder.

20              THE COURT:  Okay.  Well, have you reached out to

21     the brother?

22              MR. SIDBURY:  He is supposed to be on a pilgrimage

23     for five to six days in Saudi Arabia so, no, we haven't.

24              THE COURT:  Okay.  Mr. Smith, do you have any

25     representations you want to make?

1          MR. SMITH:  Your Honor, if it's the brother in

2     Saudi Arabia, he was one of the people who submitted one of

3     the letters.  I think we can reach out to him quickly.

4          THE COURT:  Okay.  I have read the letter.  I

5     think he's -- all of the family members are fully supportive

6     of doing whatever it takes to get the release of Mr. Ali.

7          Okay.  Mr. Sidbury, what about with respect to

8     Mr. Taherzadeh?

9          MR. SIDBURY:  Your Honor, I don't rec- -- I don't

10    recall receiving any (indiscernible).

11          Court's indulgence, Your Honor.

12          MS. PETERSON:  It was sent several days ago at

13    this point.

14          THE COURT:  Ms. Peterson, what's your

15    understanding?  Was he --

16          MS. PETERSON:  Pretrial services advised already

17    that he was -- (indiscernible).  He was found to be

18    eligible, and the address was suitable.

19          THE COURT:  Okay.  Well, then I'm going to go

20    ahead and move forward because we have a lot to get through

21    today.

22          I am going to issue my decision right now.  I am

23    going to read it; it's quite lengthy.  This will be my

24    decision.  There will be no detention memo.  So to the

25    extent there are any further proceedings with respect to

1    this issue, the parties will need to order a transcript.

2        I am going to deny the government's request that

3    these two defendants be held pending trial and order their

4    release on conditions.

5        A few housekeeping issues.

6        The first is a little more than housekeeping -- I

7    will admit -- is the issue with respect to whether or not a

8    detention hearing was triggered in this case.

9        I do agree with the government -- its analysis

10   with respect to Section 3142(f)(1)(E), which I think is

11   applicable in this case; and that this case does involve any

12   felony, and I quote:  Involved the possession or use of a

13   firearm or destructive device.  I believe that's certainly

14   true here based on the conduct outlined in the complaint

15   which involved the possession and use of firearms as part of

16   the charged conduct of impersonating a federal officer.

17       I base that conclusion on the analysis of Section

18   3142(f)(1)(E) provided in the Second Circuit's decision in

19   *U.S. v Watkins*.  I have reviewed the decision.  I did find

20   it persuasive; and I adopt and incorporate it here.

21       In any event, even if *Watkins* is wrong, I think

22   the government has sufficient basis -- although, ultimately,

23   I deny their request -- I think they certainly had

24   sufficient basis and made a sufficient showing last Friday,

25   both with respect to a potential serious risk of flight of

1    Mr. Ali, under Section 3142(f)(2)(A), and a potential risk

2    of tampering with evidence by Mr. Taherzadeh under Section

3    3142(f)(2)(B); there should have been a detention hearing in

4    this case even if *Watkins* and I am wrong with respect to

5    3142(f)(1)(E).  So I wanted to make a record of that.

6              I want to address the risk of flight.

7              First, it is the government's argument that

8    Mr. Ali is a serious risk of flight in this case.  There is

9    no argument that Mr. Taherzadeh is one.  I do -- I have

10   found that the government has not met its burden of showing

11   by a preponderance that Mr. Ali is a serious risk of flight.

12             As I understood the request in the beginning --

13   and perhaps, Mr. Rothstein, I misunderstood -- that the

14   government's major driver of this concern were these

15   potential ties between Mr. Ali and the Pakistan Intelligence

16   Service, or that the charged scheme somehow was directed or

17   funded by a foreign power seeking to target Secret Service

18   agents.

19             Mr. Rothstein has certainly made it clear

20   whatever -- perhaps it's my misunderstanding, I don't know.

21   But he certainly made it crystal clear this morning that he

22   has disavowed any assertion in this case, any suggestion

23   that this alleged crime had any connection to a foreign

24   government hostile to the United States, friendly to Mr. Ali

25   or otherwise, or any such thing.  That is something the

1    government will need to prove in any event; and I find so

2    far they haven't done so.

3            There is no reliable evidence of any foreign

4    involvement in this case.  I, for one, do not find reliable

5    Mr. Ali's alleged statement that he has ties to the Pakistan

6    Intelligence Service or the ISI.  The government has brought

7    a false impersonation charge against him.  Its whole theory

8    of the case is that he is not to be trusted when he asserts

9    who he works for, whether it's HSI, DHS, DOJ, or, in my

10   view, ISI.  It's all part of the same alleged fraudulent

11   conduct.  I do not credit his statement; it forms no part of

12   my decision here.

13           If -- there is evidence of Mr. Ali's foreign

14   travel, including to Pakistan, Iran, Egypt, Iraq, Turkey,

15   Qatar, but past foreign travel to the Middle East, even

16   unexplained travel to the Middle East, does not demonstrate

17   a serious risk of flight; the travel here is not

18   unexplained.  Rather, a rational and plausible explanation

19   has been offered by multiple family members of Mr. Ali; I

20   think his brother and his father.  And, that is, that he

21   underwent a religious conversion to Sikhism [sic] -- if I

22   said that incorrectly, my apologies -- a few years ago.  And

23   consistent with the practice of that sect of Islam, he has

24   been visiting shrines of Muslim saints and scholars around

25   the Middle East on these trips.  That explanation, in my

1    view, is certainly more plausible than any suggestion that

2    he was meeting with foreign governments to plan the

3    operation charged in the complaint, and apparently got his

4    passport stamped on the way in and out of the country when

5    doing so; it's not how foreign intelligence agents work.

6            Again, the government has not demonstrated that

7    the plausible explanation offered by the defendant with

8    respect to his foreign travel should not be credited at this

9    time.  It bears repeating that it's the government's burden

10   to prove serious risk of flight.

11           More importantly, this is not a case where the

12   defendant has no contacts in the United States.  Mr. Ali has

13   extensive contacts here -- his whole life is here; he is a

14   naturalized U.S. citizen.  He has lived here since 2001,

15   over 20 years.  He has no prior failures to appear in court.

16   No bench warrants have been issued against him; no contempt

17   convictions, or any other allegations that he's ever failed

18   to follow conditions of release set by a court.  Indeed, he

19   has no prior criminal record whatsoever; no convictions of

20   any kind.

21           He does have extensive contacts with the

22   United States.  His parents live here, his siblings live

23   here, his wife and four kids live here.  His whole life is

24   here.  He has four kids under the age of five, I might add.

25   His wife recently, I think even last Friday, had surgery on

1    her knee.  My understanding, according to the letters

2    submitted by Mr. Ali's family, is that she was doing well

3    but won't be walking for six weeks to two months, so she is

4    not going anywhere; she is not fleeing anywhere.  I doubt he

5    is leaving her and his five kids here to run away in this

6    case.  Certainly, there is no evidence that he would do so.

7         Nor is there any sign that he has wealth or assets

8    sufficient to finance a life abroad.  He has appointed

9    counsel.  Counsel's represented that no one has offered to

10   pay for his retained counsel in this case.  No one has

11   stepped forward to do that.

12        Yes, Mr. Taherzadeh said during his post-arrest

13   interview that Mr. Ali financed the day-to-day operations of

14   the charged conduct.  But there is a real question at this

15   point whether the charged conduct had a large price tag, at

16   least one paid for by these two gentlemen.  Early concern

17   that the charged conduct may have required the infusion of

18   large sums of money from someone, tens of thousands of

19   dollars in rent, for example, appears now to have been

20   overblown.

21        For example, as indicated in Mr. Taherzadeh's

22   opposition, it appears that no one paid this rent.  There is

23   now a default judgment brought by the apartment complex for

24   over $220,000 for that unpaid rent.  This does not sound

25   like, to me, something that an undercover agent for a

1    foreign government would do; it looks like a fraud case to

2    me.

3            In any event, my point here is narrower than all

4    of that.  The government has not demonstrated that Mr. Ali

5    has the absent means or the means to finance a life abroad

6    were he to flee.  Just as important, the government has not

7    demonstrated that Mr. Ali has a motive to flee.

8            Besides his whole family being here, at this point

9    in the case, he faces a charge that, though a felony,

10   carries a maximum of only three years in jail if convicted.

11   Because he has no prior criminal record, his sentencing

12   guidelines range, if he were convicted, appears to be only

13   zero to six months with a sentence of probation, an entirely

14   probationary sentence; meaning, he would not go to jail is a

15   possibility.

16           He also has a cognizable defense in this case; I

17   have no idea if it would be successful if he chooses to go

18   to trial.  He claims, as I understand it, that he was duped

19   by his codefendant, by Mr. Taherzadeh, just like the other

20   agents were.  He thought that Mr. Taherzadeh was an HSI

21   agent as well; and he, Mr. Ali, was just working for him.

22   He may prevail on that defense at trial; he may not.  My

23   point is that he has no reason to flee.  He has a defense.

24   He doesn't face much time, even if he were convicted.

25           Importantly, Mr. Ali did not flee.  In fact, prior

1    to his arrest, even after he was aware that he was under

2    investigation, there were lots of questions by a postal

3    service investigator about his and Mr. Taherzadeh's status

4    weeks before they were arrested.  Indeed, during those

5    conversations, he apparently affirmatively offered to turn

6    himself in.  Come two weeks later, when the government

7    arrested him, they apparently had no problem finding him; he

8    was right here in D.C.

9           For all of those reasons, I do find the government

10   has not proved by a preponderance of the evidence that he is

11   a serious risk of flight.  Whatever risk there may be for

12   his appearance can reasonably be assured through strict

13   conditions of release.

14          Moving on now to the government's other requested

15   grounds for detention, dangerousness; the other big one.

16          The Bail Reform Act requires the Court to consider

17   four factors outlined in Section 3142(g) in making a

18   detention decision based on dangerousness.  I should start,

19   though, by saying that this is not a rebuttable presumption

20   case as there are any number of federal crimes which

21   Congress has said there is a rebuttable presumption of

22   detention because of the nature of those crimes; the danger

23   that they represent the likelihood of recidivism.

24          This charge, this 912 charge, this impersonating a

25   federal officer charge is not such a crime.  There is no

1    rebuttable presumption of detention.  In a case like this,

2    release should be the norm.

3            The first Bail Reform Act factor that the Court

4    has to consider is the nature and circumstances of the

5    offense.  As I said, both defendants here are charged with a

6    single count of impersonation of a federal officer in

7    violation of 18 U.S.C. Section 912.  It is not a crime of

8    violence, which is one of the things the Bail Reform Act

9    requires the Court to look at; it's not.  It's not a crime

10   of violence.  It is a felony.  But, as I indicated a moment

11   ago, a felony where the maximum term of incarceration is

12   only three years; and there is no mandatory minimum period

13   of incarceration either.  I say "only" because, in my

14   experience, the government's detention requests usually

15   arise in cases where the potential penalty it sees often

16   much exceeds three years.

17           There's been some suggestion the Court should,

18   perhaps, up the ante in this case based on uncharged

19   conduct, namely Mr. Taherzadeh may have violated 18 U.S.C.

20   Section 922(g)(9) based on his prior misdemeanor domestic

21   violence convictions, which would make him a person

22   prohibited from possessing firearms under that section.  And

23   true, if the government could prove he violated that

24   statute, he would face a 10-year sentence, which would bring

25   him within the type of serious conduct this Court often sees

1    with respect to the government's detention request; but,

2    critically, that is uncharged conduct at this time.  He has

3    not been charged with a violation of 922(g)(9), and he may

4    never be charged with it.

5             The government has not presented to me any

6    evidence that Mr. Taherzadeh actually knew that his prior

7    misdemeanor convictions, which he incurred some nine years

8    ago, would preclude his possession of firearms forever into

9    the future.

10            Contrary to the government's assertion yesterday,

11   the Supreme Court has held that it is the government's

12   burden in a 922(g) case to prove that the defendant knew

13   that he was a prohibited person under that statute; that's

14   the *Rehaif v United States* case, 139 S -- Supreme Court

15   2191, the year was 2019.  That case, I believe,

16   underturned -- overturned, I should say, the line of

17   authority, including the Third Circuit case cited by the

18   government yesterday which held otherwise; the government

19   did not have the burden of showing that the defendant knew

20   that he had a qualifying conviction that would make him

21   prohibited from owning or possessing firearms.  The

22   government has to prove that here; I haven't heard any

23   evidence that Mr. Taherzadeh knew that.

24            To be clear, with respect to that point, I am only

25   talking about Mr. Taherzadeh; that is, with respect to a

1    potential 922(g) charge.

2          There is no suggestion that Mr. Ali's possession

3    of any gun in this case violated 922(g) or violated any law.

4    And he has no criminal convictions whatsoever; and his

5    possession of firearms seems to have been in compliance with

6    D.C. law.  His gun was registered, and there is no evidence

7    that he possessed it outside of his home.

8          As to the conduct the defendants are actually

9    charged with, impersonation of a law enforcement officer in

10   violation of Section 912; because of their limited criminal

11   history, as I've indicated a moment ago, they both may face

12   the very lowest end of the federal guideline, zero to six

13   months, or perhaps one to seven months for Mr. Taherzadeh

14   depending on how his criminal history is calculated.  That

15   is, as I've indicated, the lowest sentencing range available

16   in the federal sentencing guidelines; and either of those

17   ranges permit an entirely probationary sentence.

18          I believe in this case that that very low

19   guidelines range is one indication of the less serious

20   nature of the charged conduct.  But that's the same

21   conclusion I would have reached even without consideration

22   of the guidelines by looking at the circumstances of the

23   conduct proffered by the government, also just looking at

24   the statutory maximum which they've argued persuasively this

25   morning, only a three-year charge.  You know, it's not

1    unserious [sic].  I am not saying it's nothing; but it is a

2    Class E felony.  Felonies under the federal system range

3    from Class A to E; A being the most serious; E being the

4    least.  This is a Class E felony.

5              Moreover, the charged conduct does not include

6    what I would consider the most serious criminal conduct that

7    even Section 912 would seek to prohibit, that is, egregious

8    abuses of misappropriated police power, like a fake police

9    officer conducting unlawful arrests, unlawful detention, or

10   search of a citizen; conduct, which I might add, would

11   increase the offense level under the federal sentencing

12   guidelines six levels.  The government has made no proffer

13   here that any such conduct took place; nor has the

14   government presented any evidence the defendants made any

15   demands of the government, agents or employees who were

16   duped by their conduct.  There is no evidence yet, attempted

17   extortion or bribery, or other legal demand.  That may come

18   as the investigation progresses, but the government has

19   proffered no such evidence here today; and that's all I can

20   go on, the record before me now.

21             It would appear that the defendants obtained

22   private information about some of the residents of the

23   apartment complex.  Harm the government characterizes as a

24   privacy intrusion; I accept that, and I have considered it.

25   It's certainly not good.  While the defendants' possession

1    of that information is troubling to the Court, the

2    government's proffer thus far lacks detail about what that

3    information is and how it was obtained by the defendants.

4    Based on the record before me, that proffered harm appears

5    to me to be more in the nature of privacy harms, which

6    unfortunately and regularly are endured by victims in fraud

7    or white collar cases where pretrial detention is a rarity.

8            The most egregious abuse of misappropriated power

9    by the defendants proffered by the government so far, as I

10   understand the government's case, is Mr. Taherzadeh's

11   shooting of an individual in Mr. Ali's presence with an

12   Airsoft gun apparently as part of some sort of fake

13   recruiting process for a DHS job and as a means, according

14   to the complaint, of evaluating that witness's reaction and

15   pain tolerance.  That also, if true, is not good, even if

16   the individual consented to be shot by the Airsoft gun.

17           But importantly to the Court, as it evaluates the

18   seriousness of the defendant's conduct, an Airsoft gun is

19   not a firearm; rather, it's an airgun that shoots small

20   plastic pellets that may leave a bruise or welt on exposed

21   skin.  Again, not good if that's what happened.  But like

22   other aspects of this case, it strikes me as sophomoric

23   behavior and not the sort of stuff -- not the sort of

24   serious dangerous conduct that militates in favor of

25   pretrial detention.

1  Now true, as mentioned previously, there were real

2  guns involved in the charged conduct here; at least

3  Mr. Taherzadeh, he had a gun.  And he wore it outside of his

4  apartment, sometimes concealed, sometimes not.  I believe

5  that is part of the government's evidence of his

6  impersonation of a law enforcement officer.  Real federal

7  officers have guns, and so did Mr. T, Mr. Taherzadeh.  He

8  apparently liked to show them his gun; a gun, which I

9  understand, he had been denied a D.C. license to carry

10  concealed on his person.  I mean, there is evidence that he

11  never did so in violation of D.C. law.  I'd consider that as

12  part of the government's proffer; and I believe it is one

13  factor that makes Mr. Taherzadeh's conduct more serious,

14  apparently more serious than Mr. Ali.

15  Nevertheless, it is mitigated, in my view, by the

16  fact that Mr. Taherzadeh apparently registered the gun and

17  the absence of any evidence that even, when it was

18  concealed, he ever brandished the gun as part of any fake

19  police action or otherwise used it to demand or did anything

20  as far as I know, as far as the record that is before me

21  now.  That may change too.  Maybe he did, but the government

22  hasn't proven it yet.

23  And again, to be clear, there is no record that

24  Mr. Ali possessed a gun outside of his apartment where he

25  was legally allowed to have one.

1          As for the assault rifle, the only evidence of its

2     use or its intended use is Mr. Taherzadeh's shooting of it

3     at a gun range in the presence, I think, apparently of

4     another -- a real law enforcement officer; perhaps not.

5     There is at least a video of him shooting an assault rifle

6     at a gun range.  I think there is also some testimony that

7     some of the witnesses saw an assault-type rifle in one of

8     their apartments, and Mr. Ali and Mr. Taherzadeh were

9     present.  But at least, as of this weekend, the assault

10    rifle was turned over to the government by the defense, by

11    Mr. Taherzadeh.  I think that says a lot about his future

12    dangerousness going forward.

13          Finally, the government hangs much on the alleged

14    risk to national security allegedly caused by the

15    defendants' conduct because it compromised at least four

16    members of the United States Secret Service who apparently

17    accepted gifts from the defendant.  That certainly raises

18    any number of questions which I understand the government is

19    investigating.  But at this point, there's been no showing

20    that national security information was, in fact,

21    compromised; other sensitive information was, in fact,

22    compromised; or that that was the intent of the defendants

23    in giving the gifts to the federal agents in the first

24    place.

25          Certainly the government has proffered zero

1    evidence the defendants intended to infiltrate the Secret

2    Service for some nefarious purpose, or even that they

3    specifically targeted the Secret Service or intended the

4    gifts bestowed on Secret Service agents or any other federal

5    agents or employees who interacted with them would be

6    compromised; that's all the government's obligation to

7    prove.  Absent they'll find such evidence at a later time

8    and submit it to the court, in the meantime, I am not going

9    to speculate.

10          Rather, as the record presently stands, it would

11   appear that the purpose of the defendants' impersonation of

12   federal law enforcement officers was, as Mr. Ali said in his

13   interview, that they, quote:  Just wanted to feel like they

14   were on the same level with the real federal agents.

15          Not to diminish the federal felony that they have

16   been charged with, but the first BRA factor requires this

17   Court to engage in a sober assessment of the seriousness of

18   the charged conduct.  After all, the gentlemen's personal

19   liberty is at stake here.  And it can't be the case that

20   every crime the government charges -- most all of which are

21   felonies -- satisfy that first Bail Reform Act factor.

22   Though, in my experience, many of them do.

23          But, in my view, as the record presently stands,

24   this case does not -- as charged does not.  There are worse

25   crimes that have come before this one -- before this Court.

1    And indeed, in my review of the case law in this area, there

2    are significantly worse and more dangerous law enforcement

3    impersonation cases than what the government has proffered

4    here.  So, for all of these reasons, I believe the first

5    Bail Reform Act factor, the nature and circumstances of the

6    offense weighs against these defendants' detention.

7        The second factor is the strength of the

8    government's evidence.  The government appears, at this

9    point, to have a strong case with respect to

10   Mr. Taherzadeh's impersonation of a federal officer,

11   especially given his postarrest statement where he admits

12   most everything of what the government has to prove.

13       The government's case with respect to Mr. Ali is

14   somewhat less compelling; there is just less evidence with

15   respect to what he did and what his role was.  And as stated

16   previously, he may have a cognizable defense that he, too,

17   was duped by Mr. Taherzadeh just like the other federal

18   agents.

19       Nevertheless, I still find the government has

20   sufficient evidence here to convince -- to convict both of

21   the defendants of the crime that they have been charged

22   with.

23       There is a great deal of evidence especially with

24   respect to Mr. Taherzadeh regarding his representation that

25   he was an HSI agent or employee; those are laid out in the

1     complaint.  I am not going to repeat them here for time.

2          I think that there is less evidence with respect

3     to Mr. Ali.  I think Mr. Smith did a fine job in his

4     opposition outlining that fact and the relative less

5     evidence with respect to him than with respect to

6     Mr. Taherzadeh.  In any event, I still believe that there is

7     sufficient evidence to convict both of these gentlemen with

8     respect to the charged conduct.

9          I will say that a violation of Section 12 requires

10    more than mere bravado.  There does appear to be a lot of

11    bravado here.  It also requires proof of some act by the

12    defendant, within the purported authority, that he's falsely

13    impersonating some fake police act.  At this point, the

14    government has less evidence on this element; though, what

15    they have, in my review, is still sufficient to achieve a

16    conviction.

17         The government has proffered that both defendants

18    participated in the alleged recruitment of Witness 1, a

19    service employee of HSI; both defendants were present.  The

20    government proffers that Witness 1 was shot with an Airsoft

21    gun by Mr. Taherzadeh as part of this fake HSI recruitment

22    process.  I believe it's proven and is sufficient to show an

23    act within the defendants' misappropriated authority and

24    meets the requirements of the statute.  So, in sum, I do

25    find that the second Bail Reform Act factor, the strength of

1    the government's evidence, does weigh in favor of their

2    detention.  Other courts have found that that is the least

3    important of the four Bail Reform Act factors.

4          The third factor is the history and

5    characteristics of the defendant.  As I have indicated,

6    Mr. Ali has no prior criminal record.  He has no prior

7    record of failures to appear, no bench warrants, no contempt

8    convictions, or any other allegations that he's ever failed

9    to follow the conditions of release as set by the court.

10   Indeed, he has no prior criminal convictions at all.

11   Moreover, he has extensive contacts in the D.C. area; has a

12   family of responsible citizens who support him and are, as

13   far as I can tell, qualified to serve as third-party

14   custodians in this case.  So I think his history and

15   characteristics weigh in favor of his release, and clearly

16   so.

17         Mr. Taherzadeh's history and characteristics

18   are -- well, they're more mixed.  Like Mr. Ali, he also has

19   connections to the D.C. area and the support of family who

20   are willing to serve as third-party custodians.  Unlike him,

21   Mr. Taherzadeh does have a prior criminal record, although

22   it is somewhat dated, and concerns only misdemeanors; the

23   most recent of which was some nine years ago.  It was in

24   2013 when he pled guilty to domestic violence-related

25   convictions, both misdemeanors; one of them a crime of

1    violence, albeit a misdemeanor.  Prior to that he has

2    convictions for passing a bad check in 2007 and for stealing

3    in 2000, both of which appear to be misdemeanors and, at

4    this point, we are 15 and 20-some years ago.  It appears

5    that, with all of that, he has been sentenced to, at most, I

6    think about a month of actual incarceration, and that was

7    for the domestic assault in 2013.  All of his other

8    sentences were probationary terms.

9          Like Mr. Ali, he has no prior bench warrants or

10   convictions for failures to appear for court.  One of the

11   domestic violence-related convictions, however, in 2013, was

12   for violation of a protective order, which does suggest, at

13   least in that case, an unwillingness or inability to follow

14   an order of the court.  And for those reasons, I believe

15   that Mr. Taherzadeh's history and characteristics are mixed

16   and weigh in favor of his detention, but only slightly.

17         As to the fourth Bail Reform Act factor, the

18   nature and seriousness of the danger to any person or the

19   community that would be posed by the defendants' release, I

20   found -- I find that this factor weighs in favor of both of

21   these defendants' release on conditions.  This final

22   dangerousness inquiry is really the ultimate question.  Most

23   importantly, as the D.C. Circuit reminded this Court in the

24   *Munchel* case:  Thus, a defendant's detention based on

25   dangerousness accords with due process only insofar as the

1    district court determines the defendant poses a concrete

2    prospective threat to public safety.  So it is a

3    forward-looking inquiry of the defendants' dangerousness

4    upon release.

5           So it is on this factor that I think the

6    government's detention request is perhaps most efficient

7    when addressing the harms caused by the defendants' alleged

8    conduct, its application in the detention memo, and its

9    arguments I've spent almost entirely backwards looking.

10          It has articulated the harms and potential harms

11   caused by the defendants' crime of impersonating a law

12   enforcement officer when that crime was occurring; other

13   than, in one respect, the risk of Mr. Taherzadeh tampering

14   with evidence were he to be released -- which I will come to

15   in a moment -- other than in that respect, the government

16   really does not address the likelihood of public harms or

17   danger of being committed or caused or represented by these

18   defendants if they're released or any of those prior harms

19   recurring now that they're alleged criminal conduct has been

20   uncovered; and that is understandable that the government

21   has not clearly articulated how that might work.

22          In my view, it would be a difficult argument to

23   make, the defendants' conduct having been so spectacularly

24   outed as it was in this case.  They are infamous.  There are

25   people around the world who now know that neither

1    Mr. Taherzadeh nor Mr. Ali are federal agents.  In any

2    event, their badges, all of their other tactical gear, as

3    well as their guns and ammunition, as far as we're aware of,

4    have been seized.  The chance that they can repeat conduct

5    like the government claims they engaged in here during the

6    pendency of this case is, in my view, remote, and I believe

7    whatever such risk remains can be reasonably mitigated by

8    conditions of release.

9         Ms. Peterson, I believe, also made a good point

10   earlier today that, with a case like this one, because how

11   little time they realistically face even if convicted, that

12   should provide both of these defendants with a very strong

13   incentive for them not to engage in any other criminal

14   conduct while this case is pending.

15        Specifically, with respect to the government's

16   allegation that there is a serious risk that Mr. Taherzadeh

17   may tamper with evidence if released, I find that the

18   government's concerns are overblown, largely.

19        With respect to the allegation this weekend that

20   he had sent potential evidence -- empty gun casings -- in

21   the mail to a real federal agent, that that was somehow

22   evidence of obstruction -- a claim, I must admit, I didn't

23   understand even when I first read it -- that he is

24   obstructing evidence by sending it to a real federal agent.

25   In any event, Mr. Rothstein, a few hours later, backtracked,

1    withdrew -- which he rightfully should have -- when it

2    became clear, from the agent who received the property, that

3    it was that agent's property -- that Mr. Taherzadeh was

4    returning the agent's property back to the agent.

5             With respect to the government's allegation that

6    Mr. Taherzadeh turned off his location services feature and

7    GPS on his phone which prevented other agents who he had

8    befriended and provided iPhones to for knowing his location,

9    the government made clear today or this morning that it did

10   not know whether or not it was Mr. Taherzadeh who turned off

11   those location services on his phone or some other feature

12   on his phone that did so, or even the import of it if he did.

13            The government's final assertion with respect to

14   obstruction is that Mr. Taherzadeh allegedly admitted that

15   he began deleting social media posts related to law

16   enforcement in his postarrest interview; that concern also

17   appears somewhat overstated.  I have not read the 302

18   report.  But according to Ms. Peterson, during the

19   defendant's interview, he admitted to deleting a video or

20   videos on social media which showed him on a gun range,

21   videos which -- according to the defendant -- had no

22   indication that he was an HSI agent; and that he deleted

23   them to avoid the embarrassment of comments that might come

24   on social media in response to those videos.

25            I am most concerned about that admission; but it's

1    still hard for me to understand exactly what it is the

2    defendant admitted to, what it is he destroyed, and whether

3    or not he had an intent to actually destroy them to obstruct

4    this case.  I also credit the fact that that disclosure was

5    made by the defendant in a wide-ranging 5 and 1/2 hour

6    postarrest interview where he made many admissions against

7    his interest.  He, arguably, tried to come clean; I give him

8    credit for that as well.  Again, the evidentiary value of

9    the video is not clear on the record before me, nor does it

10   prove the defendant's intent to obstruct these proceedings

11   when he deleted it.

12           I will say this.  That despite being questioned

13   about his alleged status as a federal employee by a postal

14   service inspector weeks before he was arrested, and also

15   being tipped off about this investigation by the Secret

16   Service days before his arrest, Mr. Taherzadeh did not,

17   apparently, empty his apartment of inculpatory evidence.

18   The government's detention memo is replete with this such

19   evidence found in his apartment on the day of his arrest,

20   again, after he was tipped off by a citizen investigation.

21           And now, for the same reason I articulated a

22   moment ago, he has every reason not to do such a thing now;

23   every reason not to make things worse, to keep his head

24   down, get through this, and get on with his life.  Because

25   the government has not offered, in my mind, evidence that

1    Mr. Taherzadeh clearly deleted material evidence in this

2    investigation and with the intent to do so, I do not believe

3    it is proven that he is a serious risk of tampering with

4    evidence going forward were he to be released, certainly not

5    such a risk that could not be reasonably mitigated with

6    conditions of release.

7              So for all of those reasons, I am going to

8    order -- the government's motion for pretrial detention is

9    denied.  I am going to release the defendants on the

10   following conditions of release:

11             They are to submit to supervision by pretrial

12   services.  If they have not conducted an interview, they

13   need to do so.

14             I am going to place them into HISP.  Mr. Smith

15   will have to coordinate with respect to the location for

16   Mr. Haider [sic] and making sure that the owner of the home,

17   his brother, has permission for him to be there.  I have

18   every confidence that that permission will be granted given

19   the letters submitted by Mr. Haider's entire family in this

20   case; so I am going to order him into HISP -- both of these

21   gentlemen into HISP.  They are going to live in their

22   parents' residence.  They will be on home detention, with

23   the home detention version of HISP.

24             They will be GPS monitored.

25             I am going to assign both of their fathers as

1    being third-party custodians.  In a moment we can talk about

2    whether we need to expand that to other family members as

3    well.

4         They are to stay away from the apartment complex

5    where the search warrant was executed, from all airports,

6    and all embassies.

7         They are to avoid all contact directly or

8    indirectly with any person who may be a witness or a victim

9    in this case including the codefendant -- each other's

10   codefendant, except in the presence of counsel.

11        They are also to surrender their passports, not

12   obtain a passport or other travel document during the

13   pendency of this case.

14        They are to report as soon as possible to pretrial

15   services any contact with law enforcement personnel

16   including arrests, questions, and traffic stops.

17        Those are the conditions I have imposed.

18        Government, perhaps you want to be heard on

19   additional conditions.  And I realize it's over objection,

20   but here is your chance to add some conditions if you wish.

21        MR. ROTHSTEIN:  One moment, Your Honor.

22        Your Honor, we would ask for a stay until 9 a.m.

23   tomorrow morning to evaluate your opinion and make a

24   decision whether to appeal.  We will be prepared to announce

25   a decision by that time.

1          THE COURT:  Okay.  All right.  I hear you.  Great.

2     You want -- you may make an appeal.

3          I am going ask you again because this is your last

4     chance:  Do you want to add any conditions of release?  You

5     can do that without prejudice to your potential desire to

6     take an appeal in this case, Mr. Rothstein.  Okay?

7          MR. ROTHSTEIN:  Your Honor, I believe the

8     conditions that you said based on your ruling would be

9     appropriate.

10          THE COURT:  Okay.  Mr. Smith, you have heard

11     conditions of release.  Do you have any objections to those

12     conditions?

13          MR. SMITH:  No, Your Honor.  I appreciate them.  I

14     think they're fair and reasonable.

15          The only comment I would make, though, is I

16     learned, when I went to visit Mr. Ali in custody, that he

17     apparently is, for reasons that surprised me, being housed

18     in the same cell with Mr. Taherzadeh; and so perhaps that

19     may not be happening going forward now that the Court has

20     issued a stay-away.

21          THE COURT:  Okay.  Well, I will instruct my

22     courtroom deputy to indicate that these two individuals to

23     be separated; it's not a danger issue.  But, as ordered,

24     that there is to be no contact between the two other than

25     through counsel.

1          So I appreciate -- I hope they can accommodate.

2     It may not be that they can.  In any event, I am going to

3     stay the request until nine o'clock tomorrow morning so that

4     will also give the jail an opportunity to shift around, if

5     that's what it needs to do.  These defendants are not going

6     to be released until 9 a.m. tomorrow.

7          I will stay the request to allow the government to

8     decide whether or not it wants to take an appeal.

9     Government, you need to be prepared to not only make that

10    decision but to file that appeal at 9 a.m. in the morning.

11    And if you are going to file the appeal you'll need to reach

12    out to the chief judge's chambers.  She will have to

13    continue the stay; it will be her option to do that or

14    not -- and not have to scramble in the morning, if that's

15    what you choose to do.

16          Ms. Peterson, do you have any objections to these

17    conditions of release?

18          MS. PETERSON:  I do not, Your Honor.

19          THE COURT:  Okay.  Let's go ahead and take care of

20    the -- swear the defendants to the conditions.  I am just

21    going to go ahead and do all of this so it will be a package

22    ready to go.

23          We are going to issue conditions of release on the

24    record.  We'll indicate that they have been stayed until

25    9 a.m. tomorrow.  But the idea is that either the government

1    doesn't appeal -- or, if it does appeal and I am upheld on

2    appeal, the conditions will be there for the chief judge to

3    act on.

4              Mr. Taherzadeh, let's start with you first.  Have

5    you heard or understood my conditions of release?

6              DEFENDANT TAHERZADEH:  Yes, Your Honor.

7              THE COURT:  Are you prepared to comply with them?

8              DEFENDANT TAHERZADEH:  Absolutely, Your Honor.

9              THE COURT:  Mr. Tran, please swear this defendant

10   to his conditions of release.

11             (Whereupon, ARIAN TAHERZADEH was sworn.)

12             THE COURT:  Mr. Ali, have you heard my conditions

13   of release and are you prepared to comply with them?

14             You have to unmute, sir.

15             DEFENDANT ALI:  Yes, Your Honor.

16             THE COURT:  All right.  Mr. Tran, please swear

17   this defendant.

18             (Whereupon, HAIDER ALI was sworn.)

19             THE COURT:  Okay.  Mr. Masoud Taherzadeh, can you

20   hear me?

21             You need to unmute, sir.

22             THE COURTROOM DEPUTY:  Mr. Taherzadeh, you have to

23   press star 6 on your phone to unmute.

24             MS. PETERSON:  (Indiscernible.)

25             THE COURT:  Okay.  Mr. Taherzadeh, while we're

1    trying to work that out, Mr. Raza, can you hear me?

2              MR. M. TAHERZADEH:  I am here.

3              THE COURT:  Mr. Taherzadeh, can you hear me?

4              MR. M. TAHERZADEH:  Yes, yes.  Yes, Your Honor, I

5    can hear you.

6              THE COURT:  All right.  I am going to have you

7    sworn in as a third-party custodian.  Essentially, what this

8    is is you are swearing to the Court that if, Mr. Taherzadeh,

9    your son, violates any of his conditions of release, you are

10   going to report that to pretrial services and to the Court.

11             Do you understand that?

12             MR. M. TAHERZADEH:  Yes, Your Honor.

13             THE COURT:  Mr. Tran, please swear Mr. Taherzadeh.

14             (Whereupon, MASOUD TAHERZADEH was sworn.)

15             THE COURT:  Mr. Raza, you are next.  Please

16   unmute.

17             THE COURTROOM DEPUTY:  You have to press star 6 to

18   unmute.

19             THE COURT:  All right.  We need to do that.  I

20   also need to give warnings.  I am going to tell -- I am

21   going to just skip and do that because we're running out of

22   time.

23             Gentlemen, I need to give you some warnings.

24             You have heard my conditions of release.  It's

25   important that you comply with every one of them.  If you

1   fail to comply with any of my conditions of release, your

2   conditions of release can be revoked; you can be held

3   pending trial; a bench warrant can be issued for your

4   arrest.  You can also face an additional criminal charge for

5   contempt of court for having violated court-issued

6   conditions of release.

7           Also, your most important condition of release is

8   that you do not commit a state, federal, or local crime.  If

9   you were to commit such a crime, again, a warrant can be

10  issued for your arrest; your conditions of release can be

11  revoked, and you can be held pending trial in this case.

12  You could also face a longer sentence for having committed a

13  crime while on release in a federal case.

14          In a moment we're going to set a next day I

15  think -- I am not sure what we're going to do.  But it's

16  important that for any date that we set in this case, you

17  show up.  If you fail to appear for any court date, a

18  warrant can be issued for your arrest, conditions of release

19  can be revoked, and you could be held pending trial.  You

20  can also face an additional criminal charge for failure to

21  appear for court.

22          Finally, I will warn each of you that it is a

23  crime to threaten any juror or any witness in this case who

24  may have given -- who may have information about the case,

25  or to retaliate against anyone who may have given

1    information to the government in your case, to tamper with

2    evidence, to destroy any evidence in this case, or to

3    otherwise obstruct justice.

4            Mr. Taherzadeh, do you understand everything I

5    have just told you?

6            DEFENDANT TAHERZADEH:  Yes, Your Honor, I do.

7            THE COURT:  And, Mr. Ali, do you understand

8    everything I just told you?

9            DEFENDANT ALI:  Yes, Your Honor.  I understand.

10           THE COURT:  Okay.  Mr. Raza, can you hear me now?

11           MR. RAZA:  Yes, sir.  Yes, Your Honor.  I can hear

12   you.

13           THE COURT:  All right.  Mr. Raza, I need to swear

14   you in as a third-party custodian.  Essentially, as I told

15   you before when we spoke, you are now going to swear to the

16   Court that if your son were to violate any of my conditions

17   of release, you would have to report that to the Court.

18           Do you understand that?  And are you prepared to

19   do that?

20           MR. RAZA:  Yes.  Yes, sir, I do.

21           THE COURT:  All right.  Mr. Tran, please swear

22   Mr. Raza as a third-party custodian.

23           (Whereupon, SHOUTKAR RAZA, was sworn.)

24           MR. RAZA:  Definitely, sir.

25           THE COURT:  What did you say, sir?

```
 1                    MR. RAZA:  Definitely.  I do.

 2                    THE COURT:  Got it.  Okay.  Understood.

 3                    All right.  We have one minute left.

 4                    What are we doing --

 5                    MS. PETERSON:  Your Honor, I believe we need to

 6       set a preliminary hearing date.

 7                    THE COURT:  Okay.  Thank you.

 8                    Government.

 9                    MR. ROTHSTEIN:  Your Honor, if they're released,

10       then we would ask for three weeks from last Wednesday --

11                    THE COURT:  That's correct.

12                    MR. ROTHSTEIN:  Which would be -- so why don't

13       we -- based on your ruling -- set that --

14                    THE COURT:  Okay.  All right.  That will be

15       April 27th, that's three weeks from last Wednesday.  We can

16       schedule this for a preliminary hearing -- I can do it in

17       the morning, say 11 a.m.?

18                    Mr. Rothstein, does that work for you?

19                    MR. ROTHSTEIN:  That should, Your Honor.

20                    Yes, Your Honor.

21                    THE COURT:  Mr. Smith?

22                    MR. SMITH:  I have a two o'clock sentencing in

23       Greenbelt that is a lengthy sentencing.

24                    THE COURT:  This is 11 a.m., and we can do it

25       remote.
```

```
 1                    MR. SMITH:  Yeah.  That's okay.

 2                    THE COURT:  Do you want to do it at 10?  Is 10

 3       better?

 4                    MR. SMITH:  10 would be better, yes.  Thank you.

 5                    THE COURT:  All right.  Let's do 10 a.m.

 6                    Ms. Peterson, does that work for you?

 7                    MS. PETERSON:  Yes, Your Honor.

 8                    THE COURT:  Mr. Rothstein?

 9                    MR. ROTHSTEIN:  Yes, Your Honor.

10                    THE COURT:  All right.  We'll schedule this case

11       for a preliminary hearing at 10:00 a.m., April 27th.

12                    Any additional requests from the government?

13                    MR. ROTHSTEIN:  No, Your Honor.  Thank you.

14                    THE COURT:  Okay.  We're not addressing speedy

15       trial?

16                    MR. ROTHSTEIN:  Your Honor, we'd ask for the time

17       to be tolled.

18                    MS. PETERSON:  There is no reason to toll the

19       speedy trial clock at this point because he has not been

20       indicted.  So the only clock that is running is the 30 days

21       to indict, so we would object to any exclusion of speedy

22       trial.

23                    MR. ROTHSTEIN:  I'm sorry, Your Honor.  I

24       misunderstood what you were asking.

25                    THE COURT:  Well, you could try to toll the 30
```

 1    days, but I think Ms. Peterson is not --

 2                (Overlapping speakers.)

 3                MR. ROTHSTEIN:  We're not asking --

 4                THE COURT:  You don't want it?

 5                MR. ROTHSTEIN:  No, Your Honor.

 6                THE COURT:  Good enough.  That's fine.

 7                All right, then.  Anything further from the

 8    government?

 9                MR. ROTHSTEIN:  No, Your Honor.

10                MR. SMITH:  Your Honor --

11                MS. PETERSON:  Nothing from me, Your Honor.

12                THE COURT:  Mr. Smith?

13                MR. SMITH:  I just wanted to confirm with

14    Mr. Sibury, if he gets a written statement from the owner

15    about the use of the condo, is that going to be sufficient?

16                MR. SIDBURY:  The process is that I need to speak

17    to the homeowner because it can be written by anyone.  I can

18    defer to my supervisor, and we can get back to the Court

19    regarding that; but usually we have to actually speak to the

20    homeowner.

21                MR. SMITH:  All right.  I will see if I can set up

22    an international call.  Thank you.

23                THE COURT:  All right.  So do you have contact

24    information for Mr. Sidbury to work through this because I

25    am going to leave this with you, Mr. Smith.  I'm just

1   assuming this is going to happen.

2          MR. SMITH:  Me as well.  Yeah.  If I can get a

3   phone number offline.  I did email Mr. Sidbury, so he has my

4   email address.  If he can send me a direct number, I will

5   try to get someone in touch with him.

6          THE COURT:  Okay.  Mr. Sidbury, please send your

7   phone number to Mr. Smith by email.

8          All right.  Anything further, Mr. Smith?

9          MR. SMITH:  No, Your Honor.

10          THE COURT:  Okay.  This proceeding is concluded.

11          The parties are excused.  Thank you.

12          MS. PETERSON:  Thank you, Your Honor.

13          (Whereupon, the proceeding concludes, 5:02 p.m.)

**CERTIFICATE**

14

15          I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby certify
    that the foregoing constitutes a true and accurate transcript
    of my stenographic notes, and is a full, true, and complete
16   transcript of the proceedings to the best of my ability.

17          PLEASE NOTE:  This hearing was held via
    videoconference telephonically in compliance with the
18   COVID-19 pandemic stay-safer-at-home recommendations and is
    therefore subject to the limitations associated with the use
19   of technology, including but not limited to telephone signal
    interference, static, signal interruptions, and other
20   restrictions and limitations associated with remote court
    reporting via telephone, speakerphone, and/or
21   videoconferencing capabilities.

22          This certificate shall be considered null and void if
    the transcript is disassembled and/or photocopied in any manner
23   by any party without authorization of the signatory below.

24   Dated this 13th day of April, 2022.

25   /s/ Elizabeth Saint-Loth, RPR, FCRR
    Official Court Reporter