**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Crim No.: 22-cr-133 (CKK)** |
| **v.** | : | **VIOLATIONS:** |
| **ARIAN TAHERZADEH** | : | **18 U.S.C. § 371 (Conspiracy)** |
| **Defendant.** | : | **7 D.C. Code § 2506.01 (Unlawful Possession of a Large Capacity Ammunition Feeding Device)** |
| | : | **22 D.C. Code 3531 (Voyeurism)** |

**STATEMENT OF OFFENSE IN SUPPORT OF GUILTY PLEA**

Pursuant to Federal Rule of Criminal Procedure 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, ARIAN TAHERZADEH, with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

***Summary of Unlawful Conduct***

1. From beginning as early as December of 2018 and continuing through April 2022, TAHERZADEH, Haider Ali, and Subject 1 falsely assumed and pretended to be officers or employees acting under the authority of the United States government, specifically the Department of Homeland Security (DHS), the Department of Justice (DOJ), the Office of Personnel Management (OPM), other federal departments and agencies, and acted as such. TAHERZADEH, Ali and Subject 1, were never, in fact, employees of the DHS, DOJ, OPM, or any United States

government agency.

2. In furtherance of their false and fraudulent conduct, TAHERZADEH, Ali, and Subject 1 conspired to, and in fact did, the following:

a. create an entity called United States Special Police (USSP);

b. operate USSP;

c. recruit other individuals to USSP and a fictitious DHS "task force";

d. defraud apartment complexes (including the Crossing, Carver Apartments, and Sonnet, all luxury Apartment complexes in the District of Columbia) by obtaining leases under false pretenses by purporting to be officers and employees of law enforcement agencies and by later failing to pay the rent; and

e. attempt to use and did use a false and fraudulent affiliation with DHS and other government agencies to ingratiate themselves with members of federal law enforcement and the defense community, including by providing members of the United States Secret Service with gifts worth over $90,000.

***The Conspirators Use USSP to Impersonate DHS Agents and Recruit Personnel***

3. United States Special Police LLC (USSP) was a Washington, D.C., limited liability company, with a registered address associated with a residence maintained and controlled by TAHERZADEH. TAHERZADEH was the beneficial owner of USSP.

4. On USSP's website, USSP was described as a private law enforcement, investigative, and protective service headquartered in Washington, D.C. The website stated that USSP can provide law enforcement, protective services, and investigative services within a contracted jurisdiction. TAHERZADEH and Ali represented themselves to law enforcement as

investigators and/or special agents with USSP.

5. USSP was not associated or affiliated in any way with the United States Government, nor had it ever done business with the United States Government or the District of Columbia, including, but not limited to, DHS and the District of Columbia Metropolitan Police Department (MPD).

6. After January 2021, Ali helped fund USSP and paid for general expenses. Ali would often carry large amounts of cash and would use the cash to pay for USSP items and expenses, in furtherance of the impersonation scheme.

7. TAHERZADEH was aware that, in furtherance of the impersonation scheme, Ali drove a vehicle with police lights in it. Ali was never tasked by TAHERZADEH with doing any work on behalf of DHS or any other government task force or agency.

8. On several occasions, TAHERZADEH and Ali sought to recruit individuals to join their "task force" or "unit," which these individuals believed to be part of DHS and federal law enforcement. TAHERZADEH's and Ali's impersonation of federal law enforcement was a critical and necessary component of the "recruitment process."

9. The following steps were taken in in furtherance of TAHERZADEH and Ali's efforts to recruit individuals to their "task force":

10. In their assumed persona, TAHERZADEH and Ali told false and fictious stories about their background to advance the recruitment scheme. For instance, TAHERZADEH claimed to be a former Army Ranger, a former United States Air Marshal, a Special Agent with DHS, and a member of a multi-jurisdictional federal task force. In addition, TAHERZADEH claimed that he previously worked on cases related to child exploitation and undercover cases involving

confidential informants, one of whom he falsely claimed to have killed in a shootout. Ali claimed, at various times, that he was a member of DHS and/or the United States Secret Service and on a special assignment at the White House. Ali also claimed that he participated in the capture of the wife of Joaquin "El Chapo" Guzman, that his family was middle-eastern royalty, that he was a Calvin Klein model, and that his immediate relative was the head of the Inter-Services Intelligence, the Pakistani Intelligence Service. In furtherance of his deception, Ali utilized photos of current and former government officials, obtained in the course of his work as a driver with a car service, to portray himself as a legitimate federal employee.

11. TAHERZADEH told Recruit 1 that the air soft guns were to take out lights during police operations. TAHERZADEH claimed that DHS was paying for TAHERZADEH's apartments as part of his long terms undercover work. TAHERZADEH also told Recruit 1 that the Sonnet Apartments allowed him to park his car, outfitted with police lights, wherever he wanted because he was a DHS agent. TAHERZADEH claimed that a person named "Kevin Fuller" was his director, but that Ali was replacing Fuller. TAHERZADEH said that Ali was a hard-ass and TAHERZADEH needed to get approvals through him.

12. TAHERZADEH also told Recruit 1 that a previous Confidential Informant (CI) tried to kill him. TAHERZADEH claimed that he was wearing a bulletproof vest under his shirt while meeting with his CI in a garage. The CI then shot TAHERZADEH twice in the ribs but the bulletproof vest saved his life. TAHERZADEH said that he then returned fire, killing the CI. This story was also false and fictious.

13. As part of the recruitment process, TAHERZADEH instructed Recruit 1 to take a drug test and send a photo of the results. TAHERZADEH fingerprinted Recruit 1 in his apartment

and then directed Recruit 1 to be fingerprinted by MPD. TAHERZADEH also directed Recruit 1 to apply through the DCRA to become a Special Police Officer. TAHERZADEH provided Recruit 1 with a book of laws and regulations for him to review. TAHERZADEH instructed Recruit 1 on how to disarm people and the proper ways to hold a firearm.

14. In or around February or March of 2021, TAHERZADEH falsely told Recruit 2 he was Special Agent with Homeland Security Investigations (HSI). Ali falsely represented to Recruit 2 himself to be a federal official of the Office of Personnel Management (OPM) with investigative authority. TAHERZADEH told Recruit 2 that USSP was setup and funded by the federal government. Specifically, TAHERZADEH told Recruit 2 that USSP was setup as a private organization in order to allow the government to avoid record requests under the Freedom of Information Act (FOIA).

15. TAHERZADEH claimed that he had Special Police Officer credentials with MPD because, in his role as an HSI Agent, he did not have local arrest authority and the Special Police credentials provided him that authority. TAHERZADEH stated that he did not carry his HSI credentials because he is not permitted to carry two sets of credentials at the same time.

16. In or around May 2021, TAHERZADEH and Ali told Recruit 2 to be "deputized" through the MPD as a Special Police Officer, which TAHERZADEH claimed would allow Recruit 2 to assist TAHERZADEH and Ali in HSI operations. TAHERZADEH instructed Recruit 2 fill out a detailed application with MPD, which was notarized. In addition, TAHERZADEH administered two urine tests and implemented a fingerprint test on Recruit 2 and told Recruit 2 that he had submitted the fingerprints to the FBI for review.

17. In or around May 2021, as part of the recruitment process, Ali provided Recruit 2

with information and fee requirements for a shooting certification course. In furtherance of the recruitment efforts, Ali took Recruit 2 to a firearms range in Upper Marlboro, Maryland to shoot a qualification course and receive a certificate.

18. In or around June 2021, TAHERZADEH told Recruit 2 that a local fingerprint scan was required at MPD and that he had scheduled an appointment for Recruit 2 to get the scan on June 28, 2021. Recruit 2 went to MPD headquarters in Judiciary Square on the designated day but was turned away because he/she was told that he/she did not have an appointment. TAHERZADEH then provided Recruit 2 with a second date and time to be fingerprinted at MPD, but when he arrived he was denied a second time. After these two failed attempts, in order to facilitate the recruitment process, in or about July 2021, Ali accompanied Recruit 2 and Recruit 4 to MPD to get them fingerprinted.

19. While in TAHERZADEH's apartment, in the presence of Recruit 2, using live firearms, TAHERZADEH and Ali conducted weapons handling drills, including disarming an armed subject, "tap and racks" involving loading and clearing the weapon, and holstering and unholstering of the sidearm.

20. In or around July 2021, TAHERZADEH represented to Recruit 3 that he was a Special Agent with HSI and that that Ali was also affiliated with HSI. In furtherance of his impersonation, TAHERZADEH showed Recruit 3 a "HSI casefile" of a person TAHERZADEH claimed to be "working on" as well as a casefile marked "Confidential."

21. In or around mid-September 2021, TAHERZADEH "recruited" Recruit 3 to serve as an employee of HSI. As a result of TAHERZADEH's representation that he was an employee of HSI, Recruit 3 agreed to pursue DHS/HSI employment through him. TAHERZADEH

represented that he had started the process of hiring Recruit 3 as an employee of DHS/HSI and that he also had authority to "deputize" individuals as employees of DHS/HSI.

22. During a discussion of roles in HSI, with TAHERZADEH and Ali, they told Recruit 3 that he would have to carry a firearm for certain jobs. At that point, TAHERZADEH and Ali showed Recruit 3 that they were carrying handguns.

23. When TAHERZADEH asked Recruit 3 about his background, Recruit 3 told TAHERZADEH that he was divorced and, that as a result of a restraining order, he could not possess a firearm. Recruit 3 asked TAHERZADEH about handling a firearm with HSI and TAHERZADEH responded that "we can take care of that." Subsequently, TAHERZDEH told Recruit 3 that there was a private court hearing with an agent and the restraining order was removed and/or redacted from the National Crime Information Center (NCIC) and no longer in his background. Recruit 3 told TAHERZADEH he wanted to call an attorney, but TAHERZADEH told him that call would mess everything up and that, as a result of the hearing, Recruit 3 could now carry a firearm and credentials.

24. As part of the "HSI recruiting process," TAHERZADEH tasked Recruit 3 to conduct research into an individual who worked for the United States government as a contractor. Specifically, this individual provided support to the Department of Defense and Intelligence Community. Further, TAHERZADEH told Recruit 3 that as part of the recruiting process, TAHERZADEH would have to shoot Recruit 3 with an air rifle in order to "verify" him. Subsequently, Recruit 3 agreed to allow TAHERZADEH to shoot him twice in the shoulder.

25. In or around September 2018, TAHERZADEH introduced himself to Recruit 4 as an investigator with HSI, part of DHS. TAHERZADEH claimed he worked mostly on top-secret

level, complex investigations. TAHERZADEH also claimed that he served as an Army Ranger and he received training at FLETC.

26. In or around March 2020, TAHERZADEH told Recruit 4 that he might have a position for her related to his "unit." Specifically, he offered to recruit her as a Special Police Officer training position. As part of the recruitment, TAHERZADEH required Recruit 4 to sign a nondisclosure agreement, participate in online police training courses, and be shot with pellets from an airsoft gun.

27. TAHERZADEH told Recruit 4 that Ali was a part of OPM and handled administrative functions. Ali would acquire items for the "unit" including cash. TAHERZADEH told Recruit 4 that they needed to keep an eye on where Ali was receiving money from and where it was going. TAHERZADEH said that Ali was in trouble in terms of his business.

***Fraud Committed Against the Carver, Sonnet and Crossing Apartments Complexes***

28. The Crossing, Carver Apartments, and Sonnet are luxury Apartment complexes in the District of Columbia. The Crossing is located at 949 First Street SE. Carver Apartments is located at 211 Elm Street NW, and Sonnet is located at 1441 U Street NW.

29. TAHERZADEH conspired with Ali and Subject 1 to use their assumed law enforcement personas and their entity USSP to obtain leases for multiple apartments in the Sonnet, Carver, and Crossing apartment complexes. TAHERZADEH used USSP, an entity that appeared to be part of the federal government, because he was aware that he did not have the personal credit or funds to obtain an apartment in his own name.

30. TAHERZADEH, Ali, and Subject 1 lived at these apartment complexes for extended periods of time and failed to pay rent and associated fees.

31. When confronted by management about their failure to pay rent and other fees, TAHERZADEH, Ali, and Subject 1 would claim issues with USSP management and the general federal bureaucracy. On some occasions, TAHERZADEH, Ali, and Subject 1 would use invented supervisors, "Kevin Fuller" or "Morgan Noble," who were represented to be the "Director" or "Special Agent in Charge (SAC)" of USSP, and, therefore, officials of the U.S. Government, to make requests or explain delays in payments. These false and fictitious personas were also created to make the USSP appear to be a legitimate organization, part of a larger government structure.

32. While residents at The Sonnet, TAHERZADEH and Subject 1 represented themselves to be members of federal law enforcement. In this role, they were able to access video surveillance from the building and park in unauthorized spots. In one instance, TAHERZADEH had Recruit 1 contact a car owner that was in TAHERZADEH's desired spot. During that call, Recruit 1 told the car owner that the car needed to be moved because it was in the spot of a federal law enforcement officer.

33. On or about October 18, 2019, USSP, TAHERZADEH and Subject 1 were evicted from The Sonnet due to their failure to pay rent. Specifically, USSP, TAHERZADEH and Subject 1 did not pay any rent since they moved into The Sonnet. In total, The Sonnet suffered a loss of $253,202.51 from the TAHERZADEH and Subject 1's false and fraudulent conduct.

34. On or about September 27, 2019, USSP, TAHERZADEH and Subject 1, on behalf of USSP, using the name "Morgan Noble," electronically executed a lease for an apartment with a monthly rent of approximately $3,300 at Carver Apartments, in Washington, D.C.

35. On or about December 2, 2019, USSP, TAHERZADEH and Subject 1, on behalf of USSP, using the name "Morgan Noble," electronically executed two (2) leases for apartments

with monthly rents of approximately $3,750 and $3,417. Carver Apartments is managed by The UIP Companies, Inc. (UIP).

36. On April 14, 2020, an employee from UIP emailed TAHERZADEH, Subject 1, "Morgan Noble," and "Kevin Fuller" (using the fraudulent email addresses TAHERZADEH and Subject 1 had provided for those fictitious personas) regarding $50,696.70 in outstanding rent. On April 17, 2020, TAHERZADEH responded using the identity Kevin Fuller and fraudulently stated among other things,

> "As far as rent monies owed and the current breach of contract, those will be handled accordingly between our respective legal counsels, in the courts and on the record. No further discussions or actions or contact will take place in the interim. Please advise your staff not to contact our officers or agents for any matters related to the aforementioned or current matter."

37. Later that day, TAHERZADEH sent an email purporting to be from Kevin Fuller that fraudulently stated, among other things:

> "I've only been part of this unit for 3 1/2 months and I have had a lot of catch up to do and a lot of information to digest…Keep in mind the agency operates as a front end private agency but we receive state, local and federal funding and our agency is a recognized law enforcement and intelligence agency for those respective governments, and in DC operates under the authority of the Metropolitan Police Dept (MPD) so that being said, per the DC Administrative Issuance System, and the Mayor of the District of Columbia, all businesses operate under these updated orders, and while we have a lot of essential staff (special police officers, agents, etc.) the majority of our support staff and administrative personnel either have to work from home (where they have limited access to files and relevant info) or are simply on leave until this situation passes."

38. On December 28, 2020, an employee from UIP emailed TAHERZADEH, "Ari – I hear your team is moving out. Any plans to pay the rent?" TAHERZADEH falsely responded, "[a]gency will be settling the balance in Jan. – for the 3 Units. Someone from finance will be contacting you. I'm being reassigned to a different agency and the USSP unit will be disbanded in March. All monies owed will be handled by administrative personnel."

39. As of January 2021, USSP, TAHERZADEH, and Subject 1 owed Carver Apartments approximately $149,884.02 in back rent and fees. Specifically, USSP, TAHERZADEH and Subject 1 did not pay any rent since they moved into Carver Apartments.

40. On or about November 20, 2020, USSP, TAHERZADEH, and Subject 1, on behalf of USSP, using the name "Kevin Fuller," electronically executed two leases for apartments with monthly rents of approximately $5,285 for apartment 708, for the use of TAHERZADEH, and $5,275 for apartment 608, for the use of Subject 1, at The Crossing, in Washington, D.C.

41. Apartment 708 at The Crossing was maintained and controlled by TAHERZADEH. Within the apartment, including on or about April 6, 2022, TAHERZADEH maintained and possessed a Sig Sauer P229 with five (5) fully loaded large capacity ammunition feeding devices, containing a total of 61 rounds of ammunition

42. On or about December 30, 2020, USSP, TAHERZADEH, and Subject 1, on behalf of USSP, using the name "Kevin Fuller," electronically executed a lease for an apartment with a monthly rent of approximately $2,354 for apartment 509 at The Crossing, in Washington, D.C.

43. On or about January 19, 2021, USSP, TAHERZADEH, and Subject 1, on behalf of USSP, using the name "Kevin Fuller," electronically executed two leases for apartments with monthly rents of approximately $3,350 for Penthouse 5, and $4,020 for apartment 1361 at The Crossing, in Washington, D.C.

44. Penthouse 5 at The Crossing was maintained and controlled by TAHERZADEH and Ali and used as USSP's phony office. Within Penthouse 5, TAHERZADEH and Ali possessed, among other things: (1) a Glock 19 9mm handgun loaded with a large capacity ammunition feeding device, containing 17 rounds of ammunition, including one in the chamber,

seven rounds of .308 caliber ammunition, and an ammunition box with over 35 rounds of handgun ammunition; (2) unlicensed long gun components including a firearm barrel, weapon stock attachments, foregrips, a magazine cartridge and scope; (3) electronics devices including a significant quantity of surveillance equipment, approximately 30 hard drives, hard drive copying equipment, a computer server containing six modules, a machine to create and program Personal Identification Verification (PIV) cards and blank cards with embedded chips, a currency counter, several Subscriber Identification Modules (SIM) cards and antennas; and (4) law enforcement tactical gear and storage equipment including clothing with police insignias, police parking placards, a latent fingerprint kit, and equipment for breaching a door, including a sledgehammer, ram, Halligan tool, lock picking kit and axe.

45. TAHERZADEH and Ali used their false identification with law enforcement to obtain access to security footage in The Crossing building.

46. TAHERZADEH, Ali, and Subject 1 also used their assumed personas to gain obtain and retain parking garage spaces

47. TAHERZADEH and Ali used these parking spots for their personal vehicles, some of which were equipped to appear as law enforcement vehicles. TAHERZADEH and Ali also provided access to these spots to members of the USSS Secret Service for their personal use. Ali was the primary point of contact between One Parking, the parking garage operators, and the USSP.

48. On April 6, 2021, an employee of The Crossing sent an email to TAHERZADEH and ALI at the USSP email address informing them that they owed approximately $50,978.77 in unpaid rent. Soon after, TAHERZADEH falsely responded from the USSP email address and said

that a check had been processed and sent by USSP.

49. By May 2021, USSP's parking bill had not been paid and there was a balance of approximately $7,854.50. On or about May 31, 2021, Ali contacted Witness 1 (the manager of the parking garage located at The Crossing) in a three-way call with "Kevin Fuller," who Ali introduced to be his direct supervisor at United States Special Police, but was, in truth and fact, TAHERZADEH. TAHERZADEH assured Witness 1 that the payment for parking would soon be arriving. USSP never paid for the parking.

50. Throughout their tenancy, USSP, TAHERZADEH, Ali and Subject 1, failed to pay any rent on the leased apartments. As of June 22, 2022, this resulted in a loss of to The Crossing of $306,879.37 and a loss to One Parking of $7,854.50.

***Relationship with Secret Service Personnel Predicated on False Pretenses***

51. Beginning as early as Spring 2020, TAHERZADEH and Subject 1 began falsely and fraudulently identifying themselves as federal agents, specifically DHS Special Agents, to employees of the USSS. For instance, TAHERZADEH falsely represented himself to USSS Employees 2 and 3, Uniformed Division officers, that he was an HSI Agent and that he was currently in a gang unit. TAHERZADEH also falsely told USSS Employee 2 that he had previously investigated crimes against children. Similarly, TAHERZADEH falsely represented himself to USSS Employee 1, a Special Agent with the USSS, that he was an HSI Agent and that Ali was an HSI Analyst. TAHERZADEH further claimed that he was part of a covert task force.

52. TAHERZADEH and Ali attempted to and did ingratiate themselves with employees of the USSS because it provided them with cover and furthered their impersonation as a Federal Law Enforcement Officer.

53. In furtherance of their efforts to ingratiate themselves with members of law enforcement, TAHERZADEH and Ali also provided members of law enforcement with tangible and intangible items of value. For instance, TAHERZADEH provided USSS Employee 1's wife with use of what he represented to be a "government vehicle." TAHERZADEH provided USSS Employee 1 and his wife with a generator, a doomsday/survival backpack and offered to purchase and provide USSS Employee 1,a Special Agent assigned to the protective detail of the First Lady of the United States, with an AR-15 style rifle, valued at approximately $2,000.

54. TAHERZADEH provided USSS Employee 2 with a rent-free penthouse apartment for approximately one year, worth approximately $40,200 as well as an iPhone, a HSI coin, and a DHS patch.

55. TAHERZADEH provided USSS Employee 3 with a rent-free apartment for approximately one year, with an estimated yearly rent of $48,240 as well as an iPhone, a drone, a gun locker and a Pelican case.

56. These gifts were provided in the course of TAHERZADEH's friendship with USSS Employees 1, 2, and 3, and deepened their relationship.

57. Taherzadeh and USSS Employees 1, 2 and 3 were all on the same Apple Family Plan. The plan allowed TAHERZADEH to see iPhone GPS location of anyone on the plan who enabled the feature. For instance, Employee 2 would sometimes share his iPhone GPS location, even while on duty. On one occasion, TAHERZADEH and Recruit 3 visited Employee 2 while on duty near the White House complex. TAHERZADEH was able to locate Employee 2 through his iPhone GPS.

58. In furtherance of his efforts to impersonate DHS personnel, TAHERZADEH sent

USSS Employee 1 pictures of himself in law enforcement clothing including a vest with a "POLICE" patch, a shirt with "POLICE" on the sleeve, a tactical vest with a " SPECIAL AGENT POLICE CRT UNIT" patch as well as other photos with law enforcement gear in the background.

59. On or about February 2, 2022, USSS Employee 1 told TAHERZADEH that on February 17, 2022, USSS Employee 1 would be attending USSS's Glock transition course. The USSS was in the process of transitioning from P229 Sig Sauer to Glock 19 Generation 5 as the issued service weapon. At some point after USSS Employee 1 had received the issued Glock 19 Generation 5, TAHERZADEH made a comment "we are all transitioning to the Glock 19s in DHS." After TAHERZADEH made that comment, TAHERZADEH pulled a concealed, unlicensed Glock 19 Generation 5 from his appendix area. TAHERZADEH demonstrated that his was identical to USSS Employee 1's issued Glock 19 Generation 5, to include the TLR-7A Streamlight flashlight attachment.

***Unlawful Recording of Individual Engaged in Sexual Activity***

60. TAHERZADEH installed surveillance cameras outside and inside his apartment at The Crossing. Among other places, TAHERZADEH installed, maintained, and utilized surveillance cameras in his bedroom. TAHERZADEH used these cameras to record women engaged in sexual activity. TAHERZADEH showed these explicit videos to third parties. For instance, between May 27, 2021, and May 30, 2021, TAHERZADEH electronically recorded A.B.

engage in sexually activity. The recordings were made without A.B. express and informed consent.

Respectfully Submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By: ______________________
Elizabeth Aloi
Joshua S. Rothstein
Assistant United States Attorney
N.Y. Bar Number 4453759
601 D Street, N.W., Fifth Floor
Washington, D.C. 20530
Office: 202-252-7164
Joshua.Rothstein@usdoj.gov

**DEFENDANT'S ACCEPTANCE**

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charge against me. It does not include all of the facts known to me regarding this offense. I make this statement knowingly and voluntarily and because I am, in fact, guilty of the crime charged.

I have read every word of this Statement of Offense. Pursuant to Fed. R. Cr. P. 11, after consulting with my attorney, I agree and stipulate to this Statement of Offense, and declare under penalty of perjury that it is true and correct.

Date: 07/20/2022

ARIAN TAHERZADEH
Defendant

I have discussed this Statement of Offense with my client, ARIAN TAHERZADEH. I concur with her decision to stipulate to this Statement of Offense.

Date: 07/20/22

Michelle Peterson

Michelle Peterson
Assistant Federal Public Defender
Attorney for the Defendant