THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | |
| : | Crim No.: 22-cr-133 (CKK) |
| ARIAN TAHERZADEH, : | |
| : | |
| Defendant. : | |

**UNITED STATES' SENTENCING MEMORANDUM
AND MOTION FOR A DOWNARD DEPARTURE**

For nearly three-and-a-half years, the Defendant, Arian Taherzadeh, pretended to be an officer of the United States government. Together with his coconspirators, the Defendant used this false identity to defraud at least three luxury apartment complexes in Washington, D.C.; ingratiate himself with members of federal law enforcement; and recruit other individuals to unknowingly participate in his impersonation scheme. In addition, the Defendant and his coconspirators stored a cache of weapons, ammunition, and surveillance equipment in their apartments – for which they had no legitimate or lawful purpose. He has pleaded guilty to Conspiracy (Count One), Unlawful Possession of a Large Capacity Ammunition Feeding Device (Count Two), and Voyeurism (Count Three). For his dangerous and dishonest conduct, the Defendant should serve a significant sentence.

Since admitting his role in this fraud and impersonation scheme, however, the Defendant has provided substantial assistance to the United States, including providing information that likely influenced the decision of his co-conspirator, Haider Ali, to plead guilty to Conspiracy and

1

Unlawful Possession of a Large Capacity Ammunition Feeding Device. Given the Defendant's assistance to the Government's investigation, and considering the 18 U.S.C. § 3553(a) factors, the Government submits this sentencing memorandum and respectively moves for a United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") § 5K1.1 downward departure, recommending that the Court impose a sentence consistent with a Guidelines Offense Level 18 (30-37 months' imprisonment).[1]

### I.    Procedural Background

On April 19, 2022, a federal grand jury in the District of Columbia returned a three-count Indictment charging the Defendant and coconspirator Haider Ali with False Impersonation of an Officer or Employee of the United States, in violation of 18 U.S.C. § 912 (Count One), and Unlawful Possession of a Large Capacity Ammunition Feeding Device, in violation of 7 D.C. Code § 2506.01(b) (Count Two). (ECF No. 27). The Defendant was also charged with an additional count of Unlawful Possession of a Large Capacity Ammunition Feeding Device, in violation of 7 D.C. Code § 2506.01(b) (Count Three).

On July 25, 2022, the United States Attorney filed a Superseding Information charging the Defendant with Conspiracy, in violation of 18 U.S.C. § 371 (Count One); Unlawful Possession of a Large Capacity Ammunition Feeding Device, in violation of 7 D.C. Code § 2506-01(b) (Count Two); and Voyeurism, in violation of 22 D.C. Code § 3531 (Count Three). (ECF No. 48). On August 1, 2022, the Defendant pleaded guilty to the Superseding Information after entering into a

---

[1] The Government's recommendation is based on Probation's determination that the Defendant has a Criminal History Category II which, based on the agreed upon specific enhancements in the plea agreement and an offense level (ECF No. 54) would result in a guidelines range of 41-51 months' imprisonment.

plea agreement with the United States. Codefendant Ali pleaded guilty to related charges, as well as Bank Fraud, on October 5, 2022. (ECF Nos. 62 and 63).

## II. The Defendant's Criminal Schemes

As early as December of 2018, the Defendant, together with his co-conspirators, started impersonating officers or employees of the United States government, specifically the Department of Homeland Security (DHS), the Department of Justice (DOJ), the Office of Personnel Management (OPM), other federal departments and agencies. They used their fraudulent identities to defraud apartment complexes, (including The Crossing, Carver Apartments, and Sonnet, all luxury Apartment complexes in the District of Columbia); ingratiate themselves with members of federal law enforcement and the defense community; and recruit other individuals to their fictitious DHS "task force."

### a. The Conspirators Use USSP to Impersonate Homeland Security Agents

United States Special Police LLC (USSP) was a Washington, D.C., limited liability company, with a registered address associated with a residence maintained and controlled by the Defendant at least as early as Spring 2020. PSR at ¶ 18. On USSP's website, USSP was described as a private law enforcement, investigative, and protective service headquartered in Washington, D.C. *Id.* at ¶ 19. The website stated that USSP can provide law enforcement, protective services, and investigative services within a contracted jurisdiction. *Id.* For years, the Defendant and his co-conspirators represented themselves as officers of the United States Government, through their affiliation with USSP even though USSP was not associated or affiliated in any way with the United States Government, nor had it ever done business with the United States Government. *Id.*

On several occasions, the Defendant and Ali sought to recruit individuals, identified herein

3

as N.H.K., J.B., S.K. and S.K.2., to join their USSP "task force" or "unit," which these individuals believed to be part of DHS and federal law enforcement. PSR at ¶ 22. The Defendant and Ali's impersonation of federal law enforcement was a critical and necessary component of the "recruitment process." *Id.* In their assumed persona, the Defendant and Ali told false and fictious stories about their background to advance the recruitment scheme. *Id.* at ¶ 23. For instance, the Defendant claimed that he previously worked on cases related to child exploitation, and undercover cases involving confidential informants, one of whom he falsely claimed to have killed in a shootout. *Id.*

In February or March of 2021, the Defendant falsely told N.H.K. that he [the Defendant] was Special Agent with Homeland Security Investigations (HSI). *Id.* at ¶ 26. At the same time, Ali falsely represented to N.H.K. that he [Ali] was a federal official of the Office of Personnel Management (OPM) with investigative authority. *Id.* In May 2021, the Defendant asked N.H.K. to have himself "deputized" through the Metropolitan Police Department (MPD) as a Special Police Officer, which the Defendant claimed would allow N.H.K. to assist the Defendant and Ali in HSI operations. *Id.* at ¶ 27. The Defendant instructed N.H.K. to fill out a detailed application with MPD, which was notarized under false pretenses. *Id.* In addition, the Defendant administered two urine tests, fingerprinted N.H.K. and told N.H.K. that he had submitted the fingerprints to the Federal Bureau of Investigation (FBI) for review. *Id.*

In May 2021, as part of the "recruitment" process, Ali provided N.H.K. with information and fee requirements for a shooting certification course. *Id.* Ali took N.H.K. to a firearms range in Maryland to shoot a qualification course and receive a certificate. *Id.* While in the Defendant's apartment, in the presence of N.H.K., the Defendant and Ali conducted weapons handling drills,

including disarming an armed subject, "tap and racks" involving loading and clearing the weapon, and holstering and unholstering a sidearm. PSR at ¶ 29.

The next month, the Defendant told N.H.K. that a local fingerprint scan was required at MPD and that he had scheduled an appointment for N.H.K. to get the scan on June 28, 2021. *Id.* at ¶ 28. N.H.K. went to MPD headquarters in Judiciary Square on the designated day but was turned away for lack of an appointment. *Id.* The Defendant then provided N.H.K. with a second date and time to be fingerprinted at MPD, but N.H.K. upon arrival was turned away a second time. *Id.* After these two failed attempts, in order to facilitate the recruitment process, in or about July 2021, Ali accompanied N.H.K. to MPD to try to get him fingerprinted. *Id.*

Similarly, the Defendant recruited J.B. and claimed that DHS was paying for the Defendant's apartments as part of his long-term undercover work. *Id.* at ¶ 24. The Defendant directed J.B. to take a drug test, be fingerprinted by MPD, and apply to be a Special Police Officer through the District of Columbia Department of Consumer and Regulatory Affairs (DCRA). *Id.* The Defendant also fingerprinted J.B. in his apartment and instructed him on how to disarm people and the proper ways to hold a firearm. *Id.*

The Defendant also recruited S.K. to serve as an "employee" of HSI. *Id.* at ¶ 31. The Defendant represented that he had started the process of hiring S.K. as an employee of DHS/HSI and that the Defendant also had authority to "deputize" individuals as employees of DHS/HSI. *Id.* During a discussion of roles in HSI, the Defendant and Ali told S.K. that he would have to carry a firearm for certain jobs and showed him that they were carrying handguns. *Id.* When S.K. told the Defendant he had a restraining order and could not possess a firearm, the Defendant told him that he could take care of it. *Id.* at ¶ 32. Later, the Defendant told S.K. that the restraining order

5

was removed and that S.K. could now carry a firearm and credentials.  PSR at ¶ 32.  This representation by the Defendant was false.

The Defendant also told S.K. that as part of the recruiting process, the Defendant would have to shoot him with an air rifle in order to "verify" him.  *Id.* at ¶ 33.  Subsequently, S.K. agreed to allow the Defendant to shoot him twice in the shoulder with an air rifle.  *Id.*  The Defendant also directed S.K. to conduct research into an individual who worked for the United States government as a contractor and provided support to the Department of Defense and Intelligence Community. *Id.*

Finally, the Defendant also recruited another individual with the initials S.K.2. to work on his fictitious DHS task force.  *Id.* at ¶ 34.  The Defendant required S.K.2. to sign a nondisclosure agreement, participate in online police training courses, and be shot with pellets from an airsoft gun.  *Id.* at ¶ 35.

### b. *Fraud Committed Against the Carver, Sonnet, and Crossing Apartment Complexes*

The Crossing, Carver Apartments, and Sonnet are luxury apartment complexes located in Washington, D.C.  *Id.* at ¶¶ 37-40.  The Defendant conspired with Ali and another co-conspirator to use their assumed law enforcement personas and the entity USSP to obtain leases for multiple apartments in these complexes.  *Id.* at ¶ 41.   The co-conspirators used USSP, an entity that appeared to be part of the federal government, because they did not have the personal credit or funds to obtain an apartment in their own names.  *Id.*

The Defendant and his co-conspirators lived at these apartment complexes for extended periods of time and failed to pay rent and associated fees.  *Id.*  When confronted by management about their failure to pay rent and other fees, the conspirators would claim issues with USSP

management and the general federal bureaucracy. PSR at ¶ 41. On some occasions, they would use invented supervisors, "Kevin Fuller" or "Morgan Noble," who were represented to be the "Director" or "Special Agent in Charge (SAC)" of USSP, and, therefore, officials of the U.S. Government, to make requests or explain delays in payments. *Id.* These false and fictitious personas were also created to make the USSP appear to be a legitimate organization, part of a larger government structure. *Id.*

On or about October 18, 2019, the Defendant and his co-conspirators were evicted from Sonnet due to their failure to pay any rent since they moved in. *Id.* at 42. In total, Sonnet suffered a loss of $253,202.51 from the Defendant's conduct. *Id.* at ¶¶ 42, 198.

Following their eviction from the Sonnet, the Defendant and his co-conspirators fraudulently obtained three leases from Carver Apartments using their false and fictious affiliation with the federal government. *Id.* at ¶ 43. Again, the Defendant and his co-conspirators failed to pay any rent since they moved in and moved out in or around January 2021. *Id.* at ¶ 45. In total, Carver Apartments suffered a loss of $149,884.02 from the Defendant's conduct. *Id.* at ¶¶ 45, 198.

Between November 2020 and January 2021, the Defendant and his co-conspirators fraudulently obtained five leases from The Crossing using their false and fictious affiliation with the federal government. *Id.* at ¶¶ 46-48. Again, the Defendant and his co-conspirators failed to pay any rent on the leased apartments. *Id.* at ¶ 49. As of June 22, 2022, the conspirators' conduct resulted in a loss of to The Crossing of $295,277.44 and a loss of $7,854.50 to the manager of the building's parking garage. *Id.* at ¶¶ 49, 198.

Penthouse 5 at The Crossing was maintained and controlled by the Defendant and Ali and later used as USSP's phony office. *Id.* at ¶ 48. Within Penthouse 5, the Defendant and Ali

7

possessed, among other things: (1) a Glock 19 9mm handgun loaded with a large capacity ammunition feeding device, containing 17 rounds of ammunition, including one in the chamber, registered to the Defendant; (2) seven rounds of .308 caliber ammunition, and an ammunition box with over 35 rounds of handgun ammunition; (3) unlicensed long gun components including a firearm barrel, weapon stock attachments, foregrips, a magazine cartridge and scope; (4) electronics devices including a significant quantity of surveillance equipment, approximately 30 hard drives, hard drive copying equipment, a computer server containing six modules, a machine to create and program Personal Identification Verification (PIV) cards and blank cards with embedded chips, a currency counter, several Subscriber Identification Modules (SIM) cards and antennas; and (5) law enforcement tactical gear and storage equipment including clothing with police insignias, police parking placards, a latent fingerprint kit, and equipment for breaching a door, including a sledgehammer, ram, Halligan tool, lock picking kit and axe. PSR at ¶ 48.

In Apartment 708, the Defendant possessed a Sig Sauer P229 with five fully loaded large capacity ammunition feeding devices, containing a total of 61 rounds of ammunition. *Id.* at ¶ 46.

The Defendant and Ali also used their false law enforcement personas to gain access to security footage in the building as well as the apartment numbers and contact information for all of the residents. *Id.* at ¶ 48.

### c. *Relationship with Secret Service Personnel Predicated on False Pretenses*

Beginning as early as Spring 2020, the Defendant and his coconspirators began to ingratiate themselves with employees of the USSS because it helped to further their impersonation law enforcement officers. PSR at ¶ 50. For instance, the Defendant and Taherzadeh offered two Secret Service employees rent-free use of apartments at the Crossing for over a year. *Id.* Taherzadeh

also provided a secret service agent's wife with use of what he falsely represented to be a "government vehicle." PSR at ¶ 51. Taherzadeh also provided this agent and his wife with a generator, a doomsday/survival backpack and offered to purchase them an AR-15 style rifle, valued at approximately $2,000. *Id.*

### d. *Unlawful Recording of Individual Engaged in Sexual Activity*

The Defendant installed surveillance cameras outside and inside his apartment at The Crossing. *Id*. at ¶ 57. Among other places, the Defendant installed, maintained, and utilized surveillance cameras in the bedroom. *Id.* The Defendant used these cameras to record women engaged in sexual activity and showed the videos to third parties. *Id.* For instance, between May 27, 2021, and May 30, 2021, the Defendant electronically recorded A.B. engaged in sexual activity. *Id.* The recordings were made without A.B.'s express and informed consent.

### III. Recommended Sentence

#### a. The Applicable Sentencing Guidelines

The parties agree that the following Sentencing Guidelines apply for Count One (PSR at ¶¶ 66-71, 76-77)[2]:

**Conspiracy**
Base Offense Level (§§ 2X1.1(a), 2B1.1):  6
Loss (§ 2B1.1(b)(1)(H)): +14
Misrepresentations re Government Agency (§ 2B1.1(b)(9)): +2
Offense involved possession of a firearm (§ 2B1.1(b)(16)): +2
Total Offense Level for Conspiracy Count: 24

The Government agrees that a 2-level reduction is appropriate, pursuant to U.S.S.G. §

---

[2] The Probation Office has proposed a role adjustment for leader/organizer under U.S.S.G. § 3B1.1(c) (PSR at ¶ 72). The Government did not seek the role adjustment in the context of plea negotiations, given the Government's understanding of the Defendant's role in the conspiracy at the time of the plea. *See* ECF No. 54 at ¶ 4A.

3E1.1, because the Defendant has demonstrated acceptance of responsibility. PSR at ¶ 76. The Government agrees that an additional 1-level reduction is appropriate, pursuant to U.S.S.G. § 3E1.1(b), because the Defendant provided timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. *Id.* at ¶ 77. In accordance with the above and prior to any departure, the Estimated Offense Level should be 21. The United States Probation Office has placed the Defendant in Criminal History Category II. In Criminal History Category II, the Defendant has an estimated Guidelines imprisonment range of 41 to 51 months, and a fine rage of $15,000 to $150,000.

The parties also agree that under the D.C. Voluntary Sentencing Guidelines, Unlawful Possession of a Large Capacity Ammunition Feeding Device in violation of 7 D.C. Code 2506.01(b), is in Offense Severity Group M 9. PSR at ¶¶ 79-81. In Offense Severity Group M 9, the sentencing guidelines range is 0-12 months' incarceration. *Id.*

The parties also agree that Count 3, Voyeurism, in violation of 22 D.C. Code 3531, is a misdemeanor and not subject to the D.C. Voluntary Sentencing Guidelines. PSR at ¶ 83.

  **b. A Sentencing Within the Guidelines Range for Count One Appropriately Balances the 18 U.S.C. § 3553(a) Factors**

To determine an appropriate sentence for Count One, the Court must first accurately calculate the Defendant's advisory Guidelines range. "The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater

rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id*. at 101.

After calculating the correct Guidelines range, the Court should consider the various factors set forth in 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 49-50 (2007). These factors include the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence to promote respect for the law, just punishment, and adequate deterrence. 18 U.S.C. § 3553(a). The United States submits that considering these factors, a guidelines sentence at Offense Level 21 is appropriate and not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2), as it relates to Count One. The United States also submits that a fine within the applicable guidelines range of $15,000 to $150,000 is appropriate.

*First*, the nature and circumstances of the offense support a significant sentence. The Defendant's conduct was sophisticated, and his schemes continued for many years and victimized numerous people and businesses. His false association with law enforcement coupled with his improper relationship with the Secret Service, had the potential to do significant harm, including to our nation's security.

*Second,* the history and characteristics of the Defendant also support a significant sentence. Nothing about the Defendant's background as detailed in the presentence report excuses his

behavior. He appears to have been afforded ample personal and professional opportunities throughout his life.

*Third*, Defendant's sentence must also reflect the seriousness of the offense to promote the rule of law, to provide just punishment, and to provide adequate deterrence, as well as to protect the public from future crimes of the defendant. Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010). The Defendant by the nature of his crime impersonating law enforcement, has shown an utter disregard for the rule of law. As with the nature and circumstances of the offense, and the history and characteristics of the defendant, this factor supports a lengthy sentence of incarceration.

### c. The Defendant's Substantial Assistance

"Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." U.S.S.G §5K1.1. The Guidelines suggest that, in determining the appropriate reduction of a defendant's sentence based on substantial assistance, the Court may consider factors such as the court's evaluation of the significance of the defendant's assistance (taking into account the government's evaluation); the truthfulness, completeness, and reliability of information provided by the defendant; and the nature and extent of his assistance. *See* U.S.S.G. § 5K1.1(a).

The Defendant cooperated in the Government's investigation by debriefing with the Government on April 27, 2022, approximately three weeks after his arrest. The Defendant was

fully cooperative and provided information directly relevant to the prosecution of Haider Ali and the investigation of another coconspirator.  The Defendant also gave investigators access to his computer.  After debriefing, the Defendant continued to provide information to the Government as needed, including through an additional call with the Government on June 7, 2022, to discuss access to his social media and email accounts.  The information the Defendant provided about Ali and the prospect that he would testify, were likely critical to influencing Ali's decision to accept a guilty plea.  The Defendant was also ready and willing to testify at the trial of Ali.

Given the appropriate nature of a Guidelines sentence, coupled with the Defendant's substantial assistance to the Government's investigation, the Government recommends that, as to Count One, the Court depart downward from the advisory Guidelines range pursuant to U.S.S.G. § 5K1.1. and impose a sentence at Guidelines Offense Level 18 (30 to 37 months' incarceration).

With respect to Count 2, it should be noted that in Penthouse 5, the Defendant and Ali jointly possessed a Glock 19mm handgun loaded with a high-capacity ammunition feeding device. In Apartment 708, the Defendant was also in sole possession of a Sig Sauer P229 with five fully loaded high-capacity ammunition feeding devices, containing a total of 61 rounds of ammunition. In total, the Defendant possessed six fully loaded high-capacity ammunition feeding devices.  The Defendants possession of these devices was dangerous and supports a sentence of 6 months' imprisonment for Count 2.

With respect to Count 3, voyeurism, the Defendant's conduct affected a different victim than the conduct set forth in Counts 1 and 2.  The Defendant violated the privacy rights of Victim A.B. by recording her engaged in sexually explicit activity without her consent and then showing these videos to third-parties – victimizing her over and over again.  The Defendant's conduct

13

supports a sentence of 12 months' imprisonment for Count 3.

### IV.     Conclusion

For years, the Defendant, pretended to be a law enforcement officer, and then used this fake identification to commit fraud. For this dangerous and fraudulent conduct, and in recognition of his substantial cooperation in this matter, the Court should impose, as to Count One, a sentence of 30-37 months' imprisonment, consistent with Level 18 of the Sentencing Guidelines. As to Count Two, the Court should impose a sentence of six months' imprisonment. As to Count Three, the Court should impose a sentence of 12-months' imprisonment. The Government recommends that the sentences imposed for all counts run concurrently.

Respectfully Submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:  /s/
Elizabeth Aloi
Joshua S. Rothstein
Assistant United States Attorneys
N.Y. Bar Number 4453759 (Rothstein)
D.C. Bar Number 1015864 (Aloi)
601 D Street, N.W., Fifth Floor
Washington, D.C. 20530
Office: 202-252-7164 (Rothstein)
Joshua.Rothstein@usdoj.gov